IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES DIVISION/IBT,<br><br>Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>Defendant. | **8:19-CV-466**<br><br>**MEMORANDUM AND ORDER** |

This matter came before the Court on Defendant's Motion to Dismiss, Transfer, or Stay. Filing 11. A videoconference hearing on Defendant's motions took place on June 4, 2020. *See* Filing 29. Plaintiff, Brotherhood of Maintenance of Way Employes Division/IBT ("BMWED"), and Defendant, Union Pacific Railroad Company ("Union Pacific"), each appeared by counsel. Having reviewed the pleadings, original and supplemental briefing, original and supplemental evidence, and arguments of the parties, the Court grants Union Pacific's Motion to Transfer to the United States District Court for the District of Columbia.

## I.  BACKGROUND[1]

### A.  Factual Basis

BMWED is "an unincorporated labor association" headquartered in Michigan. Filing 1 at 1-2. Union Pacific is a Nebraska-based rail carrier that conducts rail operations throughout "the Western portion of the United States." Filing 1 at 2. BMWED is the collective-bargaining

---

[1] The factual basis discussed herein is comprised of allegations from the Complaint (Filing 1) and other evidence submitted by the parties relating to jurisdiction and venue. *See Sitzer v. Nat'l Ass'n of Realtors*, No. 4:19-CV-00332-SRB, 2019 WL 3892873, at *1 (W.D. Mo. Aug. 19, 2019) ("[W]hen reviewing a motion to transfer, a court may consider evidence outside of the pleadings but must draw all reasonable inferences and resolve factual conflicts in favor of the non-moving party." (quoting *Thompson v. Titus Transp., LP*, No. 11-CV-1338-EFM-KMH, 2012 WL 5933075, at *3 (D. Kan. Nov. 27, 2012))).

representative for all Union Pacific employees "working in the class or craft of maintenance of way employee." Filing 1 at 2.

As the collective-bargaining representative for these Union Pacific employees, BMWED negotiates collective-bargaining agreements. Filing 1 at 4. Such agreements are bargained-for under the Railway Labor Act ("RLA"), 45 U.S.C. § 151, et seq. Filing 1 at 3. Rather than negotiating completely new agreements, Union Pacific and BMWED periodically amend the underlying collective-bargaining agreements. Filing 1 at 3. When a party seeks to amend an agreement, it must provide written notice of the changes sought to the other involved parties. Filing 1 at 3 (citing 45 U.S.C. § 156). The parties must then negotiate the proposed terms. Filing 1 at 3. Sometimes the parties form coalitions for these negotiations, such as various unions banding together to bargain with a single rail carrier or multiple carriers uniting to bargain with a single union. Filing 1 at 5. The rail carriers often bargain collectively as the National Carriers' Conference Committee ("NCCC").[2] Filing 1 at 5.

BMWED has previously negotiated amendments to several collective-bargaining agreements with Union Pacific via the NCCC, and those amendments established a moratorium on further changes until November 1, 2019. Filing 1 at 5-6. Many of those prior negotiations occurred in Washington, D.C. at the NRLC's offices until the NRLC relocated to Arlington, Virginia in 2015.[3] Filing 26-1 at 3. However, future negotiations and mediations are not guaranteed to occur in Washington, D.C. Filing 28-1 at 2-3.

---

[2] The NCCC is the labor-relations committee that represents the National Railway Labor Conference ("NRLC"), an organization comprised of twenty-six railroads, twenty-two of which do not operate or have any employees in Nebraska. Filing 13-2 at 4; Filing 26-1 at 2. Each NRLC member chooses whether or not to authorize the NCCC to represent it in collective bargaining with employees. Filing 26-1 at 2.

[3] The parties also conducted mediation in Washington, D.C. as recently as December 14, 2017, after the NRLC relocated to Virginia. Filing 26-1 at 3.

At the time of filing, BMWED intended to serve written notice on Union Pacific "seek[ing] changes in various work rules under the different BMWED[–Union Pacific] agreements."[4] Filing 1 at 6. BMWED would prefer to bargain directly with Union Pacific and not the NCCC but anticipates Union Pacific will oppose "single carrier" bargaining and instead seek to bargain in conjunction with the NCCC. Filing 1 at 6.

In fact, in early 2019, Union Pacific sent representatives to Washington, D.C. to meet with other railroad members of the NRLC to decide whether or not to authorize the NCCC to bargain on their behalf in the upcoming negotiations. Filing 26-1 at 3. Those meetings occurred on February 28, 2019, and May 23, 2019, at "425 3rd St SW in Washington, D.C." Filing 26-1 at 3; Filing 26-2 at 3. During those meetings, Union Pacific authorized the NCCC to nationally handle bargaining on its behalf with BMWED. Filing 26-1 at 3. However, BMWED did not participate in and was not aware of these meetings. Filing 28-1 at 2.

### B. Procedural History

On October 23, 2019, BMWED filed this action seeking declaratory judgment pursuant to 28 U.S.C. §§ 2201-02. Filing 1 at 2. BMWED alleges two causes of action for violations of the RLA based on BMWED's belief that Union Pacific will refuse to bargain directly with BMWED and will instead seek to negotiate in combination with other railroad carriers. Filing 1 at 6-8. BMWED seeks a declaration that (1) Union Pacific's anticipated refusal to bargain as a single carrier would violate several sections of the RLA, and (2) Union Pacific must individually bargain with BMWED. Filing 1 at 9. BMWED also asks this Court to enjoin Union Pacific from refusing to bargain individually and grant BMWED costs and attorneys' fees. Filing 1 at 9.

---

[4] After filing, BMWED served written notice on Union Pacific of its intent to amend the parties' collective-bargaining agreements on November 4, 2019. Filing 18-3 at 25-27.

On December 26, 2019, Union Pacific filed a Motion to Dismiss, Transfer, or Stay seeking three alternate outcomes. Filing 11. First, Union Pacific asks the Court to dismiss this action based on two separate grounds: issue preclusion and failure to join necessary parties. Filing 12 at 7-14. In the alternative, Union Pacific asks the Court to transfer this case to the United States District Court for the District of Columbia (the "D.C. Court") for efficient adjudication of the issues before a judge with experience pertaining to the issues involved and in a forum that allows all relevant parties to participate. Filing 12 at 15-18. In support of transfer, Union Pacific points out that the ultimate question presented by this case, whether Union Pacific is legally barred from negotiating as a member of a coalition with BMWED, is being litigated in United States District Courts in Nebraska, Michigan, Tennessee, and Washington, D.C.[5] Filing 12 at 6. Union Pacific argues the case filed in Washington, D.C. by all twenty-six interested railroads is the most appropriate vehicle for resolution of this matter because it is the only case and jurisdiction that involves and can involve BMWED and all of the railroads. Filing 12 at 15-18.

Union Pacific further asks the Court to stay this case "pending the outcome of the D.C. litigation" if the Court declines to dismiss or transfer. Filing 12 at 18-21.

BMWED opposes Union Pacific's Motion to Dismiss, arguing that (1) itself and Union Pacific are the only necessary parties and (2) its claims are not issue-precluded because they present pure questions of law, the law has changed, the facts have changed, and issue preclusion is inequitable in this instance. Filing 17 at 17-27. BMWED also opposes the alternative requests to transfer or stay. Filing 17 at 27-32. With respect to transfer, BMWED argues it was first to file, and as such, its choice of venue should not be disturbed. Filing 17 at 27-32. Finally, BMWED also

---

[5] Union Pacific points out that BMWED filed at least three other nearly identical lawsuits against separate rail carriers in different judicial districts. *See* Filing 12 at 6. Union Pacific and the other NRLC members responded by filing suit in the D.C. Court. *See* Filing 13-1.

opposes a stay, arguing Union Pacific's arguments for dismissal are likely to fail and pointing out BMWED has moved for dismissal of the railroads' case in the D.C. Court. Filing 17 at 32.

On May 14, 2020, the Court set the matter for a hearing on Union Pacific's pending motion and requested supplemental briefing and evidence. Filing 22. In response, the parties filed additional briefs and evidence. Filing 25; Filing 26; Filing 27; Filing 28. The hearing was held on June 4, 2020, and the Court heard argument from both parties. Filing 29. For the reasons stated herein, the Court declines to rule on the motion to dismiss, denies Union Pacific's request to stay this matter, and grants Union Pacific's Motion to Transfer.

## II. DISCUSSION

### A. Motion to Dismiss

Union Pacific asks the Court to dismiss this action based on two separate grounds: issue preclusion and failure to join necessary parties. Filing 12 at 7-14. In particular, Union Pacific argues issue preclusion bars this action because the Honorable Thomas F. Hogan's ruling in *Alton & S. Ry. Co. v. Bhd. of Maint. Way Employes*, 928 F. Supp. 7 (D.D.C. 1996), is a valid judgment on the actually litigated merits of the same question raised here. Filing 12 at 7-9. Union Pacific also seeks dismissal on the basis that the other rail carriers are necessary parties that cannot be joined because this Court lacks personal jurisdiction over them. Filing 12 at 10-14.

As previously noted, this case involves the same question of law that is presented in three nearly identical cases filed by BMWED in two other federal district courts before three other federal judges. *See Bhd. of Maint. of Way Emp. Div., IBT v. Consol. Rail Corp.*, No. 2:19-cv-13112 (E.D. Mich. Oct. 23, 2019) at Filing 1; *Bhd. of Maint. of Way Emp. Div./IBT v. Norfolk S. Ry. Co.*, No. 3:19-cv-420 (E.D. Tenn. Oct. 24, 2019) at Filing 1; *Bhd. of Maint. of Way Emp. Div./IBT v. Canadian Nat'l Ry., et al.*, No. 4:19-cv-13246 (E.D. Mich. Nov. 4, 2019) at Filing 6. Similar

motions to dismiss, transfer, or stay are or were also pending in each of these other three cases. *See Consol. Rail Corp.*, No. 2:19-cv-13112 at Filing 6, Filing 7; *Norfolk S. Ry. Co.*, No. 3:19-cv-420 at Filing 15, Filing 16;[6] *Canadian Nat'l Ry., et al.*, No. 4:19-cv-13246 at Filing 6, Filing 13.[7] Further, Union Pacific and the other members of the NRLC filed suit against BMWED in the D.C. Court seeking to address the same legal question presented by the BMWED cases. *See* Filing 13-1.

      While Union Pacific primarily asks this Court to dismiss BMWED's Complaint, the Court acknowledges that questions of issue preclusion and failure to join necessary parties are pending before four separate federal district court judges. If each of the four judges rules on dismissal, the potential for conflicting rulings arises and the unnecessary duplication of judicial efforts is assured. *See GMAC/Residential Funding Corp. v. Platinum Co. of Real Estate & Fin. Servs.*, No. CIV.02-1224 RHK/AJB, 2003 WL 1572007, at *2 (D. Minn. Mar. 13, 2003) (citing 17 Moore's Federal Practice § 111.13[1][o]) ("Judicial economy is served by allowing related actions to proceed in the same district.").

      As Union Pacific aptly notes, permitting the case to proceed in this district when other cases simultaneously involve "precisely the same issues . . . pending in different District Courts leads to the wastefulness of time, energy and money that [the federal transfer statute] was designed to prevent." Filing 12 at 16 (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960)). And, as Judge Corker determined in a similar case, "dismissal . . . is inappropriate," Filing 30-1 at 4, if a single court can be permitted to address the merits of the

---

[6] On June 26, 2020, the Honorable Clifton L. Corker ("Judge Corker") of the United States District Court for the Eastern District of Tennessee ruled on a similar pending motion. Filing 30-1 at 8. Judge Corker declined to rule on Union Pacific's pending motions to dismiss and stay, instead granting its motion to transfer after declining to apply the "first-to-file" rule and finding the interest of justice "weigh[s] heavily in favor of transferring this case to the District of Columbia." Filing 30-1 at 8.
[7] Collectively, the "BMWED cases."

dismissal motion instead. For these reasons, the Court will not address the merits of Union Pacific's Motion to Dismiss because doing so would be an affront to judicial economy and uniformity. Thus, the Court turns to Union Pacific's alternative Motion to Transfer.

## B.  Motion to Transfer

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."[8] 28 U.S.C. § 1404(a). "[W]here it might have been brought" refers to a district where the plaintiff could have brought suit against the defendant. *See Hoffman*, 363 U.S. at 343–44, 80 S. Ct. at 1089–90, 4 L. Ed. 2d 1254. As with any case before a federal court, a transferee court must (1) have subject-matter jurisdiction over the case, (2) have personal jurisdiction over the parties, and (3) be the proper venue for the transferred action. *See* 15 C. Wright & A. Miller, Federal Practice and Procedure § 3845 (4th ed.) ("[C]ourts are uniform in requiring that the transferee have personal jurisdiction over the defendant and constitute a proper venue [and] both the transferor and transferee must have subject matter jurisdiction over the case."). Thus, these same elements must be present "where [a case] might have been brought" in order to confer transferee jurisdiction. Further, § 1404(a) requires the Court to consider not only where the case might have been brought but also the convenience of the parties, convenience of the witnesses, and the interest of justice.

The Court will first address the unenumerated requirements of subject-matter jurisdiction, personal jurisdiction, and venue in its discussion of whether this case might have been brought in the United States District Court for the District of Columbia before turning to the factors of

---

[8] Despite Union Pacific's apparent consent to the D.C. Court's jurisdiction, "the power of a District Court under § 1404(a) to transfer an action to another district is made to depend *not upon the wish or waiver of the defendant* but, rather, upon whether the transferee district was one in which the action 'might have been brought' by the plaintiff." *Hoffman v. Blaski*, 363 U.S. 335, 343–44, 80 S. Ct. 1084, 1089–90, 4 L. Ed. 2d 1254 (1960) (emphasis supplied).

convenience and the interest of justice which are enumerated under § 1404(a). Separately, the Court will analyze whether transfer is prohibited by the first-to-file rule. The Court concludes transfer is proper and grants Union Pacific's Motion to Transfer.

1. *Whether the Case Could Have Been Brought in the United States District Court for the District of Columbia*

As stated above, and in order to be a forum where this lawsuit "might have been brought," the D.C. Court must (1) have subject-matter jurisdiction over this action, (2) have personal jurisdiction over Union Pacific, and (3) be a proper venue. The Court analyzes these questions in turn and concludes BMWED might have brought this action in the D.C. Court.[9]

a. Subject-Matter Jurisdiction

District courts have federal-question subject-matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The parties do not dispute that the D.C. Court would have subject-matter jurisdiction over this action, presumably because this case arises under a federal statute, the RLA, 45 U.S.C. § 151, et seq. Accordingly, the Court agrees the D.C. Court would have federal-question subject-matter jurisdiction over this action.

b. Personal Jurisdiction

The Court next must determine whether the D.C. Court would have had personal jurisdiction over Union Pacific had the suit been brought there. Union Pacific argues the D.C. Court has personal jurisdiction over it because its representatives travelled to Washington, D.C. for two meetings with the NRLC board that occurred prior to BMWED filing suit. Filing 25 at 7-

---

[9] In conducting this analysis, the Court will apply the law of the transferee forum because whether or not the D.C. Court would have jurisdiction over the subject matter and parties necessarily requires applying the law of the court that would be exercising such jurisdiction.

8. At those meetings, Union Pacific authorized the NCCC to represent it in collective-bargaining negotiations with BMWED, which is the conduct that underlies this suit. Filing 25 at 7-8. Further, Union Pacific argues the parties' history of collective-bargaining activities in Washington, D.C. also provides the D.C. Court with personal jurisdiction. Filing 25 at 8-9.

BMWED responds that Union Pacific's attendance of meetings in Washington, D.C. was not purposeful but was instead random and tenuous and, further, BMWED was not involved with and did not know about those meetings.[10] Filing 27 at 6, 8-10. BMWED also argues past negotiations and mediations in Washington, D.C. did not occur with the frequency that Union Pacific suggests. Filing 27 at 7-8.

"The [D.C.] Court's exercise of personal jurisdiction over nonresidents must satisfy both the Due Process Clause and D.C.'s long-arm statute." *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 173 (D.D.C. 2018). Washington, D.C.'s long-arm statute provides that "[a] District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . transacting any business in the District of Columbia." D.C. Code § 13-423(a)(1). This inquiry requires "minimum contacts between the defendant and the forum establishing that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Cockrum*, 319 F. Supp. 3d at 173 (quoting *Swecker v. Midland Power Coop.*, 253 F. Supp. 3d 274, 278 & n.1 (D.D.C. 2017)).

This inquiry is satisfied when Courts "exercise either general or specific personal jurisdiction."[11] *Id.* (quoting *Bigelow v. Garrett*, 299 F. Supp. 3d 34, 41 (D.D.C. 2018). Sitting en

---

[10] While BMWED may not have known of these meetings, the question is not whether BMWED knew of the D.C. Court's jurisdiction but whether the case legally "might have been brought" in the D.C. Court and is now amenable to transfer. 28 U.S.C. § 1404(a).

[11] General jurisdiction "permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit," such as where a party is "at home." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56 (D.C. Cir.

banc, the United States Court of Appeals for the District of Columbia laid out the following legal

principles relating to specific jurisdiction:

> (1) [S]ection 13–423(a)(1) is coextensive in reach with the personal jurisdiction
> allowed by the due process clause of the United States Constitution; (2) there are
> no mechanical tests or talismanic formulas for the determination of personal
> jurisdiction under § 13–423(a)(1) and (b), and the facts of each case must be
> weighed against notions of fairness, reasonableness and substantial justice; (3)
> under the due process clause, the minimum contacts principle requires us to
> examine the quality and nature of the nonresident defendant's contacts with the
> District and whether those contacts are voluntary and deliberate or only random,
> fortuitous, tenuous and accidental; (4) where a nonresident defendant has
> purposefully availed itself of the benefits and protections of the District in engaging
> in a business activity in the forum jurisdiction, it is fair and reasonable to expect it
> to anticipate being sued in that jurisdiction; (5) in examining the nonresident
> defendant's contacts with the District, the focus is placed on the relationship among
> the defendant, the forum and the litigation; (6) it is reasonable and fair for the
> District to exercise specific jurisdiction where a nonresident defendant has
> purposefully directed its activities at District residents, and claims against it by a
> District resident arise out of or relate to, or have a substantial connection with the
> business transacted in the District; and (7) the District has a manifest interest in
> providing a convenient forum in which its residents may seek relief for injuries
> inflicted by the nonresident defendant, especially where litigation within the
> District would not impose an undue burden on the nonresident defendant.

*Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 329 (D.C. 2000) (internal quotation marks

and citations omitted).

The *Shoppers Food Warehouse* court went on to analyze these factors in three main

groups: (a) minimum contacts, (b) fairness and reasonableness, and (c) nexus. The Court now

applies these factors to the facts of this case. Ultimately, the Court concludes that the D.C. Court

has specific personal jurisdiction over Union Pacific.

### i. Minimum Contacts

---

2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 284, 134 S. Ct. 1115, 1122, 188 L. Ed. 2d 12 (2014)). The parties do
not argue that the D.C. Court has general personal jurisdiction over Union Pacific but instead focus on specific
personal jurisdiction. *See* Filing 25; Filing 27. This is presumably because Union Pacific is not "at home" in
Washington, D.C. Thus, the Court need not address general jurisdiction.

As to minimum contacts, the Court examines the quality, nature, voluntariness, and deliberateness of Union Pacific's contacts with the District of Columbia. *See Shoppers Food Warehouse*, 746 A.2d at 329, 331. Specifically related to the subject matter of this action, Union Pacific was physically present in Washington, D.C. by way of its representatives. Filing 26-1 at 3. On February 28, 2019, and May 23, 2019, Union Pacific met with other railroad members of the NRLC to decide whether or not to authorize the NCCC to bargain on their behalf in the upcoming negotiations. Filing 26-1 at 3. During those meetings, Union Pacific authorized the NCCC to conduct national bargaining on its behalf with BMWED. Filing 26-1 at 3.

The meetings and Union Pacific's attendance were not accidental but were voluntary associations that occurred in Washington, D.C. *Shoppers Food Warehouse*, 746 A.2d at 331. Deciding to engage in national handling or bargaining, the crux of this action, in Washington, D.C. should have caused Union Pacific to "reasonably anticipate being haled into court" by BMWED in the district where the allegedly wrongful and anticipated decision was determined by the board at several meetings. *Id.* (alterations omitted).

Demonstrating this line of reasoning, *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 51 (D.D.C. 2009), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011), involved a nonresident Board of Governors whose members were sued in their individual capacities by a former employee. Based on the nonresident defendants' attendance at one meeting "in the District" in which they were "involve[d] in the decision to terminate [plaintiff's] contract," the court found the nonresident defendants had transacted business in the District of Columbia. *Id. at* 52. In determining it had personal jurisdiction over the nonresident defendants, the Court stated that "this business had a strong nexus to [p]laintiff's cause of action because [the nonresident

defendants'] alleged involvement in the decision to terminate [plaintiff's] contract forms the basis for her retaliation and discrimination claims." *Id.*

Similarly, in *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 728 (D.C. 2011), the District of Columbia Court of Appeals addressed personal jurisdiction over nonresident members of the governing body for a sorority. The governing body met in the District of Columbia for a week and "voluntarily participated in . . . sessions or the actions relating" to management of a District of Columbia corporation. *Id.* The court found that, after attending sessions over the course of a week, "the participants could reasonably anticipate being required to defend their actions in the courts of the District without offending traditional notions of fair play and substantial justice." *Id.*

While the NRLC meetings did not involve the governance of a District of Columbia corporation as did the meetings in *Daley*, Union Pacific voluntarily attended two meetings in Washington, D.C. Filing 26-1 at 3. Further, and similarly to the nonresident defendants in *Navab-Safavi*, Union Pacific was involved in a decision, made in the District of Columbia, that involved the subject-matter of this action. Thus, Union Pacific transacted business in the District of Columbia within the meaning of D.C. Code section 13-423(a)(1).

Also relevant is the parties' course of dealing that has involved, at least to some extent, negotiations and mediations in the District of Columbia. Filing 26-1 at 3. In *DePuy Orthopaedics, Inc. v. Gault S. Bay, Inc.*, No. 3:07-CV-425RM, 2007 WL 3407662, at *2 (N.D. Ind. Nov. 13, 2007), the defendant argued the Indiana court lacked personal jurisdiction over it because it was a nonresident and did not have minimum contacts with Indiana. In analyzing the defendant's contacts with the forum district, the court noted that [the defendant]'s course of dealing with [the plaintiff] demonstrates minimum contacts with Indiana." *Id.* at 5 (citing *Hyatt Int'l Corp. v. Coco,*

302 F.3d 707, 716 (7th Cir. 2002) (considering prior negotiations and "the parties' actual course of dealing" when analyzing minimum contacts)). Specifically, the court considered the parties' prior contracts when analyzing the course of dealing. *Id.*

Similarly, Union Pacific and BMWED have a history of negotiating and mediating amendments to their various collective-bargaining agreements in Washington, D.C. Filing 26-1 at 3 While BMWED argues the NRLC's recent move of its headquarters to Virginia changes this analysis, the parties met for mediation in Washington, D.C. as recently as December 14, 2017, after the NRLC moved to Virginia. Filing 26-1 at 3. Further, the move does not change the parties' history of dealings in Washington, D.C. or the idea that Union Pacific has a history of transacting business there.

Because (1) Union Pacific transacted business in the District of Columbia and (2) the parties' course of dealing historically involves negotiations in the District of Columbia, Union Pacific has sufficient minimum contacts with the District of Columbia.

### ii. Fairness and Reasonableness

This inquiry focuses on "fair warning" that the defendant could be sued in the at-issue forum, the at-issue forum's "manifest interest" in providing its residents with a convenient forum for action against the nonresident defendant, and the burden on the defendant of litigating in that forum. *Shoppers Food Warehouse*, 746 A.2d at 331–32. As discussed above, Union Pacific's volitional acts of attending meetings and negotiating prior collective-bargaining agreements in Washington, D.C. is sufficient to provide it with fair warning that it could be sued in Washington, D.C. Further, "voluntary establishment of contacts within the forum [jurisdiction] helps to assure that litigating within that [jurisdiction] would not impose an undue burden on the out-of-state party." *Id.* at 32. There is no question that Union Pacific voluntarily attended meetings in

Washington, D.C., and neither party argues that litigating in Washington, D.C. would be a burden. In fact, litigating in Washington, D.C. would be less burdensome for all parties because there is already a case pending there between these parties that involves the same question of law at issue in the present case. *See* Filing 12 at 6. In summary, it would not be unfair or unreasonable for the District of Columbia to exercise personal jurisdiction over Union Pacific based on the facts of this case.

### iii. Nexus

To meet the requirement of nexus between the claim(s) and a defendant's contacts in a forum jurisdiction, the claim must either "arise[] out of *or* relate[] to the nonresident defendant's business activity." *Shoppers Food Warehouse*, 746 A.2d at 332. There is no question that BMWED's claims for declaratory judgment and injunctive relief based on Union Pacific's anticipated decision to collectively bargain at a national level "relate to" Union Pacific's Washington, D.C. decision to negotiate nationally with the other rail carriers. Accordingly, there is a nexus between Union Pacific's minimum contacts and BMWED's causes of action.

For the foregoing reasons, the D.C. Court has personal jurisdiction over Union Pacific.

### c. Venue

The final factor the Court must consider in order to determine whether this suit could have been brought in the D.C. Court is venue. Venue is proper in "a judicial district in which any defendant resides." 28 U.S.C. 1391(b)(1). A defendant corporation "shall be deemed to reside . . . in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2); *see also Aguilar v. Michael & Son Servs., Inc.*, 292 F. Supp. 3d 5, 10 (D.D.C. 2017) ("[A] defendant corporation resides where the corporation 'is subject to the court's personal jurisdiction with respect to the civil action in

14

question.'" (quoting 28 U.S.C. § 1392(c)(2))); 32A Am. Jur. 2d Federal Courts § 1111 ("The general civil venue statute permits venue in multiple judicial districts."). Because the D.C. Court has personal jurisdiction over Union Pacific, as discussed above, venue is also proper in the District of Columbia.

In conclusion, the D.C. Court has subject-matter jurisdiction over the causes of action in this case, personal jurisdiction over the parties, and is the proper venue. Accordingly, this case "might have been brought" in the District of Columbia. 28 U.S.C. § 1404(a).

### 2. *28 U.S.C. § 1404(a) Factors*

Having determined that the District of Columbia is a forum where this lawsuit "might have been brought," the Court must now determine whether the transfer-analysis factors under 28 U.S.C. § 1404(a) have been met. 28 U.S.C. § 1404(a) provides that "*For the convenience of parties and witnesses, in the interest of justice*, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a) (emphasis supplied).

> The Eighth Circuit Court of Appeals has "declined to offer an 'exhaustive list of specific factors to consider' in making the transfer decision, *see Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997), but district courts should weigh any 'case-specific factors' relevant to convenience and fairness to determine whether transfer is warranted." *In re Apple, Inc.*, 602 F.3d 909, 912 (8th Cir. 2010). In deciding whether to transfer a case under section 1404(a), courts typically have taken into account considerations such as the following: (1) the convenience of the parties (accessibility to records and documents, location where conduct occurred, applicability of state's substantive law); (2) the convenience of the witnesses (willingness of witnesses to appear, ability to subpoena witnesses, adequacy of deposition testimony); and (3) the interest of justice (judicial economy, plaintiff's choice of forum, comparative costs to the parties litigating in each forum, each party's ability to enforce a judgment, obstacles to a fair trial, conflict-of-law issues, advantages of having a local court determine questions of local law).

*In re Apple, Inc.*, 602 F.3d at 913.

"[I]n general, federal courts give considerable deference to a plaintiff's choice of forum and thus the party seeking a transfer under section 1404(a) typically bears the burden of proving that a transfer is warranted." *In re Apple, Inc.*, 602 F.3d at 913 (quoting *Terra Int'l*, 119 F.3d at 695). Here, after considering the convenience of the parties, the convenience of the witnesses, and the interest of justice, the Court finds that Union Pacific has borne its burden of showing transfer is warranted despite BMWED's choice to file in Nebraska.

Beginning with the convenience of the parties, courts consider the "accessibility to records and documents, location where conduct occurred, [and] applicability of [a] state's substantive law." *Melichar*, 309 F. Supp. 3d at 726. Courts also consider the parties' "ease of travel." *In re Apple, Inc.*, 602 F.3d at 913. Here, Union Pacific resides in Nebraska, *see* Filing 1 at 2, but is willing to litigate in Washington, D.C. in conjunction with the already-filed D.C. Court case. BMWED is based in Michigan but apparently has an office in the District of Columbia and will have to travel for any in-person hearings, whether such hearings are in Nebraska or Washington, D.C. However, both parties' primary attorneys are based in Washington, D.C. While both parties argue that this matter is a purely legal question that will not involve significant facts, documentation, or discovery, *see* Filing 12 at 17; Filing 17 at 17, to the extent this matter involves records or documentation, Union Pacific notes such documentation is located at the NCCC headquarters just outside of Washington, D.C. Filing 12 at 18. As for the location where the conduct occurred, the Court has already addressed that a portion of the underlying conduct occurred in Washington, D.C. *See supra* Section II.B.1.b.i. The legal issues in this case center around interpretation of the RLA, a federal statute, not any substantive state law. Therefore the parties' comfort and familiarity with Nebraska state law has no bearing on the Court's analysis. In sum, the convenience-of-the-parties factor weighs slightly in favor of transfer based on the location

of the parties' counsel and any relevant documents and the location where the underlying conduct occurred.

As to convenience of the witnesses, courts look to the "willingness of witnesses to appear, ability to subpoena witnesses, [and] adequacy of deposition testimony" along with the witnesses' location. *Melichar*, 309 F. Supp. 3d at 726; *In re Apple, Inc.*, 602 F.3d at 913 (considering the location of potential witnesses). While the parties have not expressly addressed potential witnesses in this case, the convenience of any such witnesses would also favor transfer. A case involving a purely legal question will not require fact witnesses. To the extent any witnesses are involved, those same witnesses will presumably also be involved in the currently pending D.C. case, and litigating at least two cases in conjunction with one another will reduce the hassle for witnesses. The Court finds no reason to believe the parties would have an easier or harder time subpoenaing witnesses in one locale over the other or in arranging their travel to Washington, D.C. rather than Nebraska. Thus, this factor slightly favors transfer.

Turning to the interest of justice, the Court finds this factor strongly favors transfer. "Courts weigh the interest of justice factor very heavily." *GMAC/Residential Funding Corp.*, 2003 WL 1572007, at *2 (citing *Radisson Hotels Int'l, Inc. v. Westin Hotel Co.*, 931 F. Supp. 638, 641 (D. Minn. 1996)). "The interest of justice factor 'may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result.'" *Id.* (quoting *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 221 (7th Cir. 1986)). The interest of justice includes considerations such as "judicial economy, plaintiff's choice of forum, comparative costs to the parties litigating in each forum, each party's ability to enforce a judgment, obstacles to a fair trial, conflict-of-law issues, advantages of having a local court determine questions of local law." *Melichar*, 309 F. Supp. 3d at 726.

17

"[J]udicial efficiency and consistency are significant factors to consider in deciding whether a defendant has met its burden of showing convenience and fairness support a transfer of venue under § 1404(a). *Midwest Athletics & Sports All. LLC v. Xerox Corp.*, No. 8:17CV478, 2018 WL 6427872, at *5 (D. Neb. Dec. 6, 2018) (citing *In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009)). As discussed above relating to the Court's decision declining to dismiss, judicial economy is best served by litigating in front of one federal district judge rather than four judges. *See GMAC/Residential Funding Corp.*, 2003 WL 1572007, at *2 (citing 17 Moore's Federal Practice § 111.13[1][o]) ("Judicial economy is served by allowing related actions to proceed in the same district."). Here, there is no question that judicial resources would be best utilized by litigation in a single court (the D.C. Court) where all parties may be joined. In this manner the parties will obtain a single, "national" result rather than numerous "local" and piecemeal decisions from multiple courts. *See* Filing 30-1 at 7 (Judge Corker finding that "judicial economy weighs in favor of transferring the current matter to the District of Columbia to allow the identical cases to be decided in a single action").This is particularly true because "[t]he avoidance of duplicative or piecemeal litigation is a factor that weighs in favor of transferring an action to a district in which all parties can be joined in a single action." *GMAC/Residential Funding Corp.*, 2003 WL 1572007, at *2 (citing *Houk v. Kimberly-Clark Corp.*, 613 F. Supp. 923, 932 (W.D. Mo. 1985)). Because all relevant parties are involved in the already-pending D.C. action, this consideration heavily favors transfer.

Turning to BMWED's choice of forum, the Court finds this factor counsels against transfer given the deference courts afford the plaintiff's choice of forum. *See In re Apple, Inc.*, 602 F.3d at 913.

18

Lastly, and related to efficiency and the interest of justice, transfer would send this case to the D.C. Court where a case is pending which involves an identical question of law and to which both Union Pacific and BMWED are parties. *See Alton & S. Ry. Co., et al. v. B'hood of Maint. Way Employes Div./IBT*, No. 1:19-cv-03586 (D.D.C. Nov. 27, 2019). Accordingly, the convenience of the parties favors transfer.

Turning to the factors or the comparative costs to the parties litigating in each forum, each party's ability to enforce a judgment, and obstacles to a fair trial, the Court finds these factors weigh in favor of transfer as well. *See Melichar*, 309 F. Supp. at 726. Given the similar litigation ongoing in the D.C. Court, transfer would presumably reduce the cost of litigation to both parties by consolidating nearly identical cases. However, the parties do not address these factors, and the Court finds no reason for these factors to change its assessment that litigation in Washington, D.C. is preferable to the case proceeding in Nebraska.[12] On balance, the interest of justice, particularly judicial economy, strongly favor transfer to the D.C. Court.

In conclusion, the convenience of the parties and witnesses slightly favors transfer and the interest of justice strongly favors transfer. As a result, Union Pacific has met its burden of demonstrating that § 1404(a)'s factors ultimately warrant transfer. The Court further finds that this case "might have been brought" in the D.C. Court. Thus, transfer is proper under 28 U.S.C. § 1404(a). The Court now turns to the question of whether the first-to-file rule bars transfer.

*3. First to File*

The general rule is that "the first court in which jurisdiction attaches has priority to consider the case." *Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1005 (8th Cir. 1993) (citing *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119, 121 (8th Cir. 1985)). This first-filed

---

[12] As discussed above, this case involves interpretation of the RLA and not local law; thus, application of local law by a local court is an irrelevant consideration.

rule "is not intended to be rigid, mechanical, or inflexible but is to be applied in a manner best serving the interests of justice," and it should be applied absent compelling circumstances. *Id.* (citations omitted). The underlying policy goals of applying the first-filed rule are "conserv[ing] judicial resources and avoid[ing] conflicting rulings." *Id.* at 1006. Finally, the first-filed rule "yields to the interests of justice, and will not be applied where a court finds compelling circumstances supporting its abrogation." *Id.*

An example of a "red flag" indicating compelling circumstances exist to avoid application of the first-filed rule is a lawsuit for declaratory judgment. *Id.*; *Boatmen's First Nat. Bank of Kansas City v. Kansas Pub. Employees Ret. Sys.*, 57 F.3d 638, 641 (8th Cir. 1995). An action seeking declaratory judgment is red-flagged because "such an action may be more indicative of a preemptive strike." *Id.* (citing *U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 489 (8th Cir. 1990)). Here, although BMWED filed first in Nebraska, there is no question BMWED's complaint was a preemptive strike. BMWED brought this action based on its anticipation that Union Pacific would seek to bargain nationally as a member of the NCCC. *See* Filing 1 at 6; *see also* Filing 30-1 at 7 (Judge Corker finding that "BMWED brought this suit in anticipation that [the railroad] would oppose local handling").

Further, the first-filed rule "yields to the interests of justice," *Nw. Airlines, Inc.*, 989 F.2d at 1005, and, as discussed above, the interest of justice, particularly judicial economy, strongly favors transfer. *See supra* Section II.A; II.B.2. Lastly, the purpose of the first-filed rule is to avoid conflicting rulings and conserve judicial resources. Here, application of the rule would likely increase conflicting rulings and would not conserve judicial resources because it would require multiple courts to litigate the same issues rather than allowing the court with jurisdiction over all parties (Washington, D.C.) to address these matters together. Applying the first-filed rule in this

case and allowing this matter to be litigated throughout the country is antithetical to the policy objectives of the first-filed rule. Given this rationale and that the interest of justice and judicial economy *strongly* favor transfer, the Court finds there are compelling circumstances supporting its decision not to apply the first-filed rule. *See* Filing 30-1 at 7-8 (Judge Corker concluding that "[j]udicial economy warrants consolidation" and "the interests of justice, including systemic integrity and fairness, weigh heavily in favor of transfer[]"). Accordingly, the first-to-file rule will not prevent the transfer of this case to the United States District Court for the District of Columbia.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant Union Pacific's motion as to transfer and will transfer this case to the United States District Court for the District of Columbia. The Court will deny Union Pacific's motion to stay as moot. Defendant's motion to dismiss shall remain pending to be decided after transfer.

IT IS THEREFORE ORDERED:

1. Defendant's Motion to Dismiss, Transfer, or Stay (Filing 11) is granted as to transfer;

2. The case shall be transferred to the United States District Court for the District of Columbia;

3. Defendant's Motion to Stay (Filing 11) is denied as moot; and

4. Filing 11 will remain pending as to Defendant's Motion to Dismiss, to be decided after transfer.

Dated this 1st day of July, 2020.

BY THE COURT:

Brian C. Buescher
United States District Judge

21